IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL CASE NUMBER: |
| NICHOLAS L. JOHNSON | : | 1:14-CR-435-SCJ-JSA |

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Nicholas Johnson's Motions to Suppress Identification [23], which seeks to suppress an identification of him by a co-conspirator, and to Suppress Cellular Telephone Records [22] [26]. As explained further below, the Court **RECOMMENDS** that the Motions be **DENIED**.

## Factual Background

The Court convened an evidentiary hearing on Defendant's Motion to Suppress Identification Testimony on March 26, 2015 [28], at which the sole witness was Special Agent ("S/A") Stephen Ryskowski of the Federal Bureau of Investigation ("FBI"). *See* Transcript of Evidentiary Hearing [34] ("Tr."). S/A Ryskowski explained that this case involved an investigation of an unusually high number of apparently fraudulent claims reported by a company called Asurion, which offers insurance on cellular telephone products. *Id.* at 12-13. The FBI's investigation revealed numerous suspected fraudulent claims filed by someone

using an internet protocol address and/or telephone numbers associated with Co-Defendant LaQuitta Brackins, which led the FBI to seek and obtain a warrant to search Brackins's residence.  *Id.*  During the search, the agents found numerous suspected fake identification cards, suspected fraudulent claim forms, and packagings for cellular telephones that the agents believed were shipped as part of the fraud scheme.  *Id.* at 13-14.

Agents also searched the contents of a telephone associated with Brackins, and discovered records of numerous contacts with a particular number later associated with Defendant Johnson.  *Id.* at 14-17.[1]  The investigators then caused a grand jury subpoena to be issued to the provider of Defendant Johnson's telephone service.  *Id.* at 18.  The provider's records showed a pattern by which, just before or after Johnson spoke or texted with Brackins, Johnson often texted another specific telephone number.  *Id.* at 19.  The agents traced that new telephone number back to an individual named Tony Thomas, who was employed as a delivery truck driver at Federal Express.  *Id.*  This raised a particular suspicion because Asurion explained that Federal Express was used to ship the cellular phone products at issue in the fraud scheme.  *Id.* at 21.  During the approximately 16

---

[1] The telephone number was not in Defendant Johnson's name.  Rather, the subscriber listed in the provider's record was Thomas Bryant.  Tr. at 36.  However, in Co-Defendant Brackins's phone, the number was associated with the contact name, "Nick."  Tr. at 16-17.

month period from January 2013 through April 2014, Thomas and Johnson communicated over 1,400 times. *Id.* at 19.

S/A Ryskowski interviewed Thomas at Federal Express, after Thomas was specifically called in by his supervisor for the purposes of the meeting. Tr. at 39-40. The agent told Thomas that the Government was investigating a fraudulent cellular telephone scheme and that it believed Thomas was involved in helping deliver fraudulent shipments to someone else. *Id.* at 42-43. Thomas ultimately confessed and cooperated with the agent, and admitted that he was working with "somebody" to deliver packages to. *Id.* at 22. He explained how and when he first met this person, later identified as the Defendant, at a specific address and apartment number. *Id.* at 23. Thomas remembered with "no doubt or hesitation" the specific street address where he first met the Defendant, approximately 12 to 18 months before the interview with S/A Ryskowski. *Id.* at 26. The agent was able to confirm this detail by finding in Asurion's claim records a delivery to Brackins's name, at the address identified by Thomas, in January 2013, which was approximately 16 months prior to Thomas's meeting with S/A Ryskowski. *Id.* at 26-27.

S/A Ryskowski showed Thomas a single photograph, which was of Defendant Johnson. Without displaying any doubts, Thomas identified the individual in the photograph as the person to whom he had been delivering

packages, but stated that he knew the person (i.e., Defendant) as "Albert." *Id.* at 23-25.  The agent asked the Defendant "you don't know him as Nick Johnson?" *Id.* at 45.  Thomas responded, "no, he told me his name was Albert."  *Id*.  The agent did not show Thomas any other photographs and did not ask Thomas to provide any physical description prior to showing him the Defendant's photograph.  *Id.* at 23-25.

Over the course of the next 16 months, Defendant Johnson paid Thomas in $10 and $20 cash increments to assist in this scheme.  Specifically, Thomas provided Johnson with addresses to which phones could be nominally shipped, but Thomas would actually deliver the phones in person to Defendant at a location along the route that would be arranged by text communication.  *See Id.* at 30-32.  Thomas told the Agent that he delivered approximately 115 to 125 packages in person to "Albert," i.e., the Defendant, during this time period.  *Id.* at 30-31.

## Discussion

### A.    *The Accomplice's Identification Testimony Should Not Be Denied*

The Supreme Court has developed a two-step test for determining whether an out-of-court identification based on a lineup or photo array is so unreliable as to violate due process. *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977).  "The primary evil to be avoided is the substantial likelihood of irreparable mistaken identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). First, the

Defendant bears the burden to show that the out-of-court photo identification procedures used were unduly suggestive. *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987). If the court finds that the procedures are unduly suggestive, it must then determine whether the identification, given the totality of the circumstances, creates a substantial risk of misidentification. *Id.; Neil v. Biggers*, 409 U.S. 188, 196 (1973)(*citing Simmons*, 390 U.S. at 384). The burden rests with the Government as to the second step. *United States v. Wade*, 388 U.S. 218, 240 (1967). If both steps end with an answer in the affirmative, the court must set aside the out-of-court identification. *Biggers*, 409 U.S. at 197. A subsequent in-court identification will only be suppressed if, after considering the *Biggers* factors, there is a "very substantial likelihood of irreparable misidentification." See *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (explaining that short of a "very substantial likelihood of irreparable misidentification .... such evidence is for the jury to weigh").

　　The Court answers the first step in the Defendant's favor, and the Government does not argue otherwise. Indeed, this case involves a single photograph display, which this Circuit has made abundantly clear "is one of the most suggestive methods of identification and is always to be viewed with suspicion." See *Hudson v. Blackburn*, 601 F.2d 785, 788 (5th Cir. 1979); *United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir.1980) (procedure unduly suggestive

where witness was shown one photograph of the defendant)[2].

However, as noted above, even unduly suggestive procedures do not require suppression if the Government can show based on the totality of facts that the identification was nonetheless reliable. *See Manson*, 432 U.S. at 109-114. In making this determination, the Court is to consider the five factors set by the Supreme Court in *Biggers*: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199–200.

The most important factor here is Thomas's opportunity to know, view and recognize the Defendant. After all, this is not the case of a fleeting bystander identification, or that of a stranger. The Government adduced facts showing that Thomas was a co-conspirator who regularly and frequently interacted with the Defendant over an approximately 16-month period, as recently as two months before the identification. According to Thomas's statements to the agent, he exchanged over 1,000 texts with and personally delivered over 100 packages to

---

[2] *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (C.A.11 1981) (*en banc*) (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the Eleventh Circuit)

Defendant during this time.[3]  These were direct, face-to-face interactions, and this extended relationship gave Thomas a strong basis to know and recognize the Defendant.  *See, e.g. United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995) (the likelihood of misidentification is substantially less when a witness is asked to identify someone with whom he is acquainted, rather than a stranger); *United States v. Castro*, 243 F.Supp 2d 565, 570–571 (W.D.Va.2003) (single-photograph identification reliable where witness was identifying a business associate).

It is unfortunate that the agent did not ask Thomas to provide a physical description of "Albert," prior to displaying any photograph, and this omission weighs against finding reliability.  But the record includes other facts that support the accuracy and reliability of Thomas's recollection.  Thomas specifically remembered important details, such as the specific address and apartment number where he first met the Defendant (a fact corroborated by the agent's review of

---

[3] It is not clear from the testimony how many separate deliveries occurred during this sixteen month period.  According to Thomas's statements to the agent, he delivered 115-125 packages during this time period to the Defendant.  This does not necessarily mean that the two conspirators met that same number of times, because more than one package may have been delivered in any given meeting.  Although the Court cannot make findings as to the precise number of interactions between the conspirators, it infers that they met many times.  According to the agent's analysis of the phone records, Thomas and Defendant Johnson communicated frequently and consistently every month, and there was no month without communication.  *See* Tr. at 33.  Because the communications often were in connection with setting up specific deliveries, this pattern suggests that the deliveries were likely similarly constant and frequent throughout this sixteen month period.

Asurion's loss data), and the specific name "Albert" by which he knew the Defendant.  Indeed, that Thomas insisted the Defendant went by "Albert," even after the agent pointedly asked, "you don't know him as Nick Johnson?" suggests that Thomas was not just parroting back facts he believed that the agent already suspected.  Thomas's lack of hesitation in identifying Defendant and the relatively short time elapsed since Thomas last saw Defendant – two months – further support a finding of reliability.

Of course there are grounds by which a jury might disbelieve Thomas's identification.  After all, Thomas had been confronted with his own criminal acts, and had a clear incentive to curry favor with Agent Ryskowski and to point the finger at someone else.  But that credible issues remain for a jury to resolve does not mean that suppression is warranted.  There are sufficient facts as to reliability such that admission of Thomas's identification would not violate the Fifth Amendment.  *See Quinones v. Miller*, 224 Fed.Appx. 44, 50(2d Cir. 2007) (unpublished) (Because "the identification evidence met the minimum threshold of reliability," any remaining issues of fact as to reliability or credibility were reserved for the jury to resolve).  That finding disposes of the sole question before this Court, and Defendant's Motion to Suppress Identification Testimony [23] should be **DENIED**.

      **B.**    *The Motion To Suppress Phone Records [22] [26] Should Be Denied*

In response to a grand jury subpoena that called for production of subscriber and payment information, call detail records, and non-content text message data for Defendant Johnson's telephone, the telecommunications provider Sprint apparently also produced historical geolocational cell site data to the Government.  This cell site data had not been requested.  It is not disputed that such cellular site information was not obtainable by way of a grand jury subpoena under the Stored Communications Act, 18 U.S.C. § 2703(c)(2), and instead required a Court order under §§ 2703(c) and (d).

Government counsel indicated that the Government does not intend to utilize the unrequested cell site information, but stopped short of guaranteeing that no derivative use of the information would ever be made in the case.  *See* Tr. at 5-7.  Defendant argues that the historical cell site information – including all derivative use – should be suppressed because the Government violated the Fourth Amendment by obtaining it without a warrant, and also because the material was produced by Sprint in violation of the Stored Communications Act, and apparently beyond the scope of the subpoena.

The Defendant's Fourth Amendment argument was recently rejected by the Eleventh Circuit in *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (en banc).  *Davis* states that the Government does not conduct a search or otherwise violate the Fourth Amendment by obtaining (without a warrant) business records

showing a subscriber's historical geolocational cell site data. *Id.* This precedent binds the Court and compels denial of the Defendant's Fourth Amendment argument for suppression of the cell site information here.

As for Defendant's statutory argument, it is certainly odd that the provider produced the cell site information to the Government without a request, and despite the lack of a Court order. Nevertheless, the Eleventh Circuit and other courts have held that a violation of the Stored Communications Act does not itself give rise to the remedy of suppression. *See United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003); *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014); *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008). This again requires denial of the motion to suppress [22] [26].[4]

## CONCLUSION

As explained above, the Court **RECOMMENDS** that Defendant's Motions to Suppress Phone Records [22][26] and Identification Testimony [23] all be

---

[4] The Court finds no fault with the Government, which did not request the material. This is another reason to deny suppression, since the exclusionary rule was fashioned as a tool to deter illegal police practices. Moreover, while §§ 2703(c) and (d) limits the ability of the Government to request certain records, these sections do not in and of themselves purport to restrict a provider from producing more information than what was requested. A provider's voluntary and *sua sponte* production of cell site information beyond the scope of a subpoena may violate privacy agreements with the customer but does not specifically violate the Stored Communications Act.

**DENIED**.

Defendant's Motion for James Hearing [24] was **DEFERRED** to the District Court on March 26, 2015, as this motion relates to the admissibility of trial evidence.  With the District Judge's consent, the Court also **DEFERS** the Defendant's Motion to Suppress Phone Recordings [21],because the sole issue raised in that motion is the voluntariness of an informant's consent to recordings of conversations with the Defendant.  That issue can be efficiently raised and determined during trial if necessary.  With no other pretrial matters before the undersigned, this case is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 15th day of July, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE